**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| DIANE P STEVENS, ET AL. | CIVIL ACTION |
| VERSUS | NO. 13-5102 |
| ALLSTATE INSURANCE COMPANY | SECTION "L" (4) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### I.   PROCEDURAL HISTORY

This action arises out of a flood insurance claim made by Plaintiffs Diane and Bobby Stevens against their flood insurer, Defendant Allstate Insurance Company, for damage their house sustained during Hurricane Isaac. On July 18, 2013, the Stevens brought a complaint alleging that Allstate breached their insurance contract and failed to tender payment for losses covered under that contract. (Rec. Doc. 1). Specifically, the Stevens sought reimbursement for those losses, court costs, and any other fair and equitable relief. *Id*. In its answer, Allstate denies the allegations and asserts various affirmative defenses.  (Rec. Doc. 5). On March 20, 2014, by joint stipulation, the parties dismissed all but the breach of insurance contract claim. (Rec. Doc. 18).

This matter came on for trial before the Court without a jury on June 12, 2014. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the memoranda submitted by the parties, the Court now makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such; to the extent that a conclusion of law constitutes a finding of fact, the Court also adopts that as such.

**II.      FINDINGS OF FACT**

This action arises out of a flood insurance claim made by the Stevens for damage their house sustained as a result of Hurricane Isaac, which came ashore August 28, 2012. The property, which is located in LaPlace, Louisiana, was inundated with 12 to 14 inches of water for over a day. The Stevens' insurer, Allstate, is a write-your-own program ("WYO") carrier participating in the National Flood Insurance Program ("NFIP"), and it issued a standard flood insurance policy ("SFIP"). The SFIP covers a term lasting from November 22, 2011, to November 22, 2012, and has coverage limits of $165,000.00 for structural damage and $26,300.00 for contents damage, each of which is subject to a $1,000.00 deductible.

After the Stevens submitted a claim, Allstate initiated the adjustment process. In doing so, it assigned an independent adjuster, Rich Christie, through Pilot Catastrophe Services, who inspected the property on September 7, 2012. Specifically, the estimate included the cost to repair and replace the damaged parts of the property, as well as associated services. Based on the adjuster's estimate, Allstate paid the Stevens $84,132.76 for structural damage. (It also paid them $21,300.00 for contents damage, which is the policy limit.) Subsequently, the Stevens and Allstate both sought additional estimates. Kevin Manale, hired by the Stevens, provided an estimate of $179,789.13. Among other things, Mr. Manale's estimate was significantly higher because it included the cost of replacing rigid foam in the exterior walls by removing the brick façade of the house. Based on Mr. Manale's estimate, the Stevens made a supplemental claim for $79,867.36 (that is, the difference between the $84,132.76 they had been paid and the $165,000.00 coverage limit and deductible).

Thereafter, John Crawford, hired by Allstate, provided an estimate of $96,422.60. Mr. Crawford's estimate was largely identical to Mr. Christie's estimate, but included the cost of replacing the Stevens' tile floors. His estimate did not include the cost of replacing the rigid foam because he had determined that it had not been damaged. Further, he suggested that if there was any damage such damage could have been remedied by removing the foam from the interior of the house after the drywall and insulation had been removed, rather than incurring the ancillary costs associated with removing the brick façade. In either event, the issue of the rigid foam is irrelevant as the parties stipulated both prior to trial and at trial that it did not need to be replaced.

The Stevens used the payments from Allstate to substantially repair the house. The evidence and testimony of Mr. Stevens indicates that he acted as the general contractor, purchasing most of the materials and performing much of the work with Mrs. Stevens, and their two daughters. Additionally, he hired a number of presumably unlicensed subcontractors to gut, replace the floors, hang drywall, paint, and perform electrical and plumbing work. Many of these subcontractors were paid by check or in cash. The Stevens have produced documentation of $49,711.94 in repair and replacement costs, but state that they are unable to document the remainder of what was spent. They allege that they spent the entire amount Allstate paid as well as some of their personal funds, but they also concede that some of the repairs were upgrades. Mrs. Stevens testified that she had additional receipts, but that those were accidentally lost.  The Stevens state that they do not know exactly how much they have spent on repairs, nor do they know exactly how much they will need to be spent. They indicate that some of the payments were made in cash but they do not know the amount of those payments. They have no notes or

3

other accounting of any cash payments. Nor have they produced any bank statements indicating any cash withdrawals around the time the work was done.

The evidence and testimony of Mr. Stevens, Mr. Manale, and Mr. Crawford conclusively establishes that all but several items have yet to be repaired or replaced: five windows, the front door, a shower door, two refrigerators and a stove, an access door in the garage, and the garage door itself. It is undisputed that each of these items is included in Mr. Christie's estimate, as well as those of Mr. Manale's, and Mr. Crawford. Accordingly, Allstate has already paid for their repair or replacement and may not be held liable for those costs now. Moreover, all of the estimates include at least a 10% profit and 10% overhead for a general contractor. Such cost was not incurred by the Stevens since they did not use a general contractor.

Although the Stevens testified that some of the repairs were substandard, the testimony of Mr. Crawford and—to a lesser extent—that of Mr. Manale indicate that the repairs are well within acceptable tolerances. Regardless, the Stevens' assertion does not appear to be substantiated by evidence. In contrast, Mr. Crawford asserted that the Stevens' house was in very, very good condition and the repairs were all but complete. Further, even if there were some indication that the repairs were deficient, it is far from apparent that the cost to remedy those deficiencies should be borne by Allstate rather than the Stevens, who supervised or performed those repairs.

## III.    CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 4072 as well as 28 U.S.C. § 1331, § 1332, and § 1337.  SFIPs are governed by statute and Federal Emergency Management Agency ("FEMA") regulations. *Worthen v. Fid. Nat'l Prop. & Cas. Ins.*

*Co.*, 463 F. App'x 422, 426 (5th Cir. 2012) (citing 42 U.S.C. § 4011(a)). Any interpretation of those regulations by FEMA also governs, as long as that interpretation is not inconsistent with the regulations or plainly erroneous. *Id.* (citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)). SFIPs must be "'strictly construed and enforced.'" *Id.* (quoting *Gowland v. Aetna*, 143 F.3d 951, 954 (5th Cir.1998)). "In addition, the insured is charged with constructive knowledge of the policy provisions and of the NFIP . . . 'regardless of actual knowledge of what is in the [r]egulations or of the hardship resulting from innocent ignorance.'" *Id.* (quoting *Fed. Crop. Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) (alteration in original))). Although federal law governs SFIPs, "general principles of state insurance law may be useful" in interpreting them. *Id.* at 425.

Although the SFIP issued to the Stevens by Allstate "provides three methods for settling losses," only the "replacement cost" provision is applicable in this instance. *See* 44 C.F.R. pt. 61, app. A(1), art. V(1). That provision is something of a misnomer in that it incorporates both a "replacement cost" approach and an "actual cash value" approach in settling claims.[1] It provides:

> The following loss settlement conditions apply to a single-family dwelling . . . :
>
> (a)    [The insurer] will pay to repair or replace the damaged dwelling after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
>       (1)    The building limit of liability . . . ;

---

[1] Customarily, the actual cash value approach allowed immediate payment regardless of whether repairs had been made or would be made, whereas the replacement cost approach allowed payment only after repairs had actually been made. *See Need for Replacement to Actually Be Made*, 12 COUCH ON INS. § 176:59 (3d ed.). Stated differently, the actual cash value approach is unlike the replacement cost approach because it "makes the insured responsible for bearing the cash difference necessary to replace old property with new property." *Introduction; Types of Provisions*, 12 COUCH ON INS. § 176:56 (3d ed.). Further, the replacement cost may well exceed the actual cash value. *Id.*

      (2)      The replacement cost of that part of the dwelling damaged, with materials of like kind and quality and for like use; or

      (3)      The necessary amount actually spent to repair or replace the damaged part of the dwelling for like use.

      . . . .

(c)      When the full cost of repair or replacement is more than $1,000, or more than 5% of the whole amount of insurance that applies to the dwelling, [the insurer] will not be liable for any loss under [subsection (a)] above . . . unless and until actual repair or replacement is completed.

(d)      [The insured] may disregard the replacement cost conditions above and make claim under this policy for loss to dwellings on an actual cash value basis. [The insured] may then make claim for any additional liability according to [subsections (a) and (c)] above, provided [the insured] notif[ies the insurer] of [their] intent to do so within 180 days after the date of loss.

*Id*. art. VII(V)(2)(a)-(d).

Previously, this Court indicated that Allstate's liability arose under subsection (d) because subsection (a) only applied if the repair or replacement had been completed (and it had not been). Regardless of whether the liability arises under subsection (a) or (d), the Stevens are unable to demonstrate that they are entitled to more than they have already been paid by Allstate.

If subsection (a) is applicable, Allstate is required to pay the replacement cost. Here, that is the necessary amount actually spent to repair or replace the damaged part of the dwelling for like use. The Stevens have not demonstrated, through evidence or testimony, that they actually spent more than $84,132.76 (the amount received from Allstate). The evidence—largely in the form of receipts—establishes that they spent, at most, $54,610.91. The testimony does not provide any basis for concluding they spent more than this. Accordingly, the Stevens are not entitled to any additional payment under subsection (a).

If subsection (d) is applicable, Allstate is required to pay the actual cash value. Because the actual cash value is determined soon after damage occurs, it ordinarily is established via an estimate. It equals the estimated replacement cost, minus any depreciation. Although an estimate provides a basis for the loss at the point the damage occurs, it is useful—if not necessary—to consider the actual expenses incurred in determining the validity of that estimate. With the exception of five windows, three doors, two refrigerators, a stove, and some painting, the Stevens' have repaired or replaced everything included within the scope of Mr. Christie's estimate. In addition, the Stevens repaired or replaced several items with items of greater value (for instance, they upgraded their heating, ventilation, and air conditioning system). It is difficult to test the estimate against what the Stevens have spent because the evidence is less than comprehensive. Although there is a dispute as to which items should have been included in the estimate, there is general agreement about what the price of each item was. Thus, Mr. Christie's estimate can be said to have fairly reflected the actual cash value of the items that it included within its scope. However, the testimony of Mr. Manale and Mr. Crawford make it clear that Mr. Christie should have also included the cost of replacing the tile floor in his estimate. Mr. Crawford's estimate indicates that removing and replacing the tile floor would cost approximately $15,758.02. Mr. Christie's estimate indicates that cleaning the tile floor, replacing the grout, sealing the grout, and applying an antimicrobial agent would have cost approximately $2,601.55. Thus, the Stevens should have received about $13,156.47 more for the repair and replacement of their tile floors. However, it is also necessary to consider the fact that there were certain expenses the Stevens did not incur. Mr. Christie's estimate also included $13,324.94, for a general contractor's overhead and profit (according to Mr. Manale and Mr. Crawford, this is the

accepted industry rate). Because the Stevens did not use a general contractor, they did not incur these costs.[2] Thus, this amount must be debited. Thus, the amount paid should have been increased by $13,156.47 for the tile floors but decreased by $13,324.94 for unspent contractor overhead and profit. This results in an aggregate decrease in the payment from of $168.47. Accordingly, the Stevens are not entitled to any further payment under subsection (d). Regardless of whether the Stevens were entitled to the replacement cost under subsection (a) or the actual cash value under subsection (d), they have not demonstrated that they were entitled to more than Allstate has already paid.

## IV.    SUMMARY

On the basis of the above findings of fact and conclusions of law, the Court finds that the Stevens are not entitled to further payment under the SFIP. Accordingly, **IT IS ORDERED** that their claims be **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 24th day of June, 2014.

UNITED STATES DISTRICT JUDGE

---

[2] FEMA has indicated that an insured may not recover for such costs:

Generally, allowances for Overhead and Profit may not be charged for the [insured's] supervision of construction. However, if there is a full explanation, up to 10 percent Overhead may be charged. No Profit may be charged in the case of a [insured's] supervising construction."

*See* FEMA Bulletin W-13064.